In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 07-3197, 07-3198 & 07-3199

CITIZENS AGAINST RUINING THE ENVIRONMENT,
ENVIRONMENT ILLINOIS, PEOPLE OF THE STATE
OF ILLINOIS, et al.,

*Petitioners,*

*v.*

ENVIRONMENTAL PROTECTION AGENCY,

*Respondent,*

and

MIDWEST GENERATION, LLC,

*Intervening-Respondent.*

_____

Petitions for Review of Orders of
the Environmental Protection Agency.
Nos. V-2005-1, V-2005-3, V-2006-2

_____

ARGUED MAY 29, 2008—DECIDED JULY 28, 2008

_____


Before FLAUM, MANION, and EVANS, *Circuit Judges*.

EVANS, *Circuit Judge*.    In this consolidated appeal of
three related administrative review proceedings, the
petitioners, several environmental protection groups and
the attorney general of the State of Illinois, challenge the
failure of the federal Environmental Protection Agency

(EPA) to object to certain operating permits proposed by the Illinois Environmental Protection Agency (IEPA) pursuant to the Clean Air Act (CAA). The petitioners contend that the Administrator was obligated to object because they clearly "demonstrated" that the permits were not in compliance with the CAA. *See* 42 U.S.C. § 7661d(b)(2). The EPA, on the other hand, maintains that the Administrator reasonably exercised his discretion in determining that the petitioners did not "demonstrate" a violation because their petitions called for further investigation and analysis, a task the Administrator found to be more appropriately carried out through the CAA's enforcement process. The petitioners argue that the CAA grants the Administrator no such discretion.

Title V of the CAA requires major stationary sources of air pollution to obtain operating permits incorporating the CAA's requirements and establishes a procedure for federal authorization of state-run Title V permitting programs. *See id.* §§ 7661-7661f. Title V does not impose additional requirements on sources but rather consolidates all applicable requirements in a single document to facilitate compliance. *See id.* § 7661a(a). In Illinois, a polluting source must apply to the IEPA for an operating permit. After negotiations between the IEPA and the source and an opportunity for public comment, the IEPA submits a draft permit to the EPA for review. *See id.* § 7661d. The EPA has 45 days to object. If the EPA does not object, within 60 days of the expiration of the 45-day review period any person may petition the EPA to object to the permit. The EPA then has 60 days to grant or deny the petition. The EPA must object to the permit "if the petitioner demonstrates to the Administrator that the permit is not in compliance with the requirements" of the

CAA. *Id.* § 7661d(b)(2). The denial of a petition is then subject to judicial review. *Id.* §§ 7607(b)(1), 7661d(b)(2).

Permit applications must include a compliance plan "describing how the source will comply with all applicable requirements" of the CAA. *Id.* § 7661b(b)(1). If a source is in compliance, it must provide a statement that it will continue to comply with the requirements of the CAA and will timely meet any additional applicable requirements that become effective during the permit term. 40 C.F.R. § 70.5(c)(8)(ii)(A), (B). If a source is not in compliance, it must develop a "schedule of compliance," outlining how it plans to come into compliance with "all applicable requirements" of the CAA. *Id.* § 70.5(c)(8)(iii)(C). The schedule of compliance must be included in the permit itself. 42 U.S.C. § 7661c(a). And the permittee must promptly report any deviations from the permit's requirements. *Id.* § 7661b(b)(2).

In addition to permitting authority, the CAA provides the EPA with enforcement powers. If the Administrator finds that a source "has violated or is in violation of any requirement or prohibition of an applicable implementation plan or permit," he must notify the source and the state by issuing a notice of violation (NOV). *Id.* § 7413(a)(1). The Administrator then has several options: (1) issue an order requiring compliance, (2) render an administrative penalty, or (3) bring a civil action. *Id.* Under the latter enforcement option, the United States, on behalf of the EPA, may sue for a permanent or temporary injunction, to assess and recover a civil penalty, or both. *Id.* § 7413(b). In addition, a citizen's suit provision generally authorizes "any person [to] commence a civil action . . . against any person . . . who is alleged to have violated . . . an emission standard or limitation" of the CAA. *Id.* § 7604(a)(1).

Midwest Generation is an operator of multiple, large, coal-fired power plants in Illinois. Our case involves six of those plants: the Fisk, Crawford, Will County, Powerton, Joliet, and Waukegan stations.[1] Midwest's predecessor, Commonwealth Edison, originally submitted applications to the IEPA for Title V operating permits back in 1995. The IEPA then proposed permits, which prompted petitions requesting that the Administrator object. After reviewing the proposed permits, the EPA concluded that the IEPA had failed to respond to significant public comments and directed it to respond to concerns about the need for compliance schedules for alleged opacity[2] and new source review (NSR)[3] violations. The IEPA

---

[1] The attorney general's claims relate to all six power plants, whereas the environmental groups' claims relate only to the Fisk and Crawford stations.

[2] Opacity, a measurement usually stated as a percentage, is the amount of light that is blocked by a medium such as smoke. *See generally Sierra Club v. E.P.A.*, 353 F.3d 976, 982 (D.C. Cir. 2004). Illinois has a 30 percent opacity limit for facilities generally, with an exception allowing emissions for greater than 30 percent for 8 minutes in any 60-minute period, provided that this occurs no more than three times in any 24-hour period. Ill. Admin. Code tit. 35, § 212.123 (1996). A 20 percent opacity limit applies to emissions from power plants where construction or modification began after April 14, 1972. *Id.* § 212.122(a).

[3] NSR consists of two programs: prevention of significant deterioration (PSD) and nonattainment NSR. Under the PSD program, no source that would emit substantial quantities of pollutants may be constructed or "modified" unless a permit prescribing emission limitations has been issued. *See* 42 U.S.C.

(continued...)

responded and proposed revised permits, none of which contained a compliance schedule.

The EPA did not object to the IEPA's revised permits within the 45-day period. The Illinois attorney general and the environmental groups then filed petitions requesting that the Administrator object to the permits. The petitions raised two grounds for objection: (1) Midwest's power plants regularly exceeded opacity limits, yet the IEPA's proposed operating permits did not include a schedule of compliance; and (2) Midwest had "modified" its power plants, thereby making NSR provisions "applicable requirements," but the IEPA's proposed operating permits failed to require compliance with NSR rules.

The Administrator denied the petitions in three orders, the content of which is almost identical.[4] Regarding opacity requirements, the Administrator found that the petitioners failed to demonstrate an ongoing violation requiring a schedule of compliance. His finding was

---

[3] (...continued)
§§ 7475(a)(1), 7479(1), (2). The preconstruction permit must impose the "best available control technology" (BACT). *Id.* § 7479(3).

In nonattainment areas (that is, where air quality standards have *not* been met), new and "modified" sources are required to obtain preconstruction permits, to offset emissions increases with emissions reductions from other sources in the area, and to install the "lowest achievable emission rate" technology, which is more stringent than BACT. *See id.* § 7503.

[4] Although the CAA provides that the Administrator "shall grant or deny such petition within 60 days after the petition is filed," *id.* § 7661d(b)(2), it took 19 months—and a consent decree—before a decision was reached in this case.

based on two facts: (1) the IEPA reviewed each source's opacity data and did not find a sufficient basis to include a compliance schedule in the permits; and (2) each source submitted a compliance certification. The Administrator concluded that "the Title V petition process is not the appropriate venue to drive discretionary enforcement decisions of the permitting authority, particularly when the petitioner fails to demonstrate that a violation of the Act has occurred."

Regarding NSR requirements, the Administrator found that the petitioners failed to demonstrate that the permits violated the CAA. His finding was based on the fact that Midwest had not applied for any NSR permits; therefore, there was no determination that NSR requirements applied to the plants at issue. In addition, no court had issued an order finding that Midwest violated the CAA by failing to apply for NSR permits. As a result, the Administrator found that "the allegations made by the Petitioners do not contain sufficient specific information to demonstrate that the . . . permits are deficient." He concluded that the issue called for further investigation, which the EPA prefers to do through its enforcement arm. Relatedly, the Administrator noted that the IEPA added a condition to the permits to ensure that they would not be "shielded" from an enforcement action.

A short time after the Administrator denied the petitions to object, the EPA issued an NOV to Midwest and its predecessor, finding opacity and NSR violations at the six plants at issue here. The Illinois attorney general subsequently appealed the decisions denying her petitions to object (Nos. 07-3198 and 07-3199), seeking review of both the opacity and NSR issues. The environmental groups also appealed the decision denying their

petition to object (No. 07-3197) but only sought review of the opacity issue.

Because the CAA does not provide a standard of review, we review the EPA's decision under the Administrative Procedure Act (APA), which contemplates setting aside agency actions only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). *Chevron* deference also guides our analysis. It first instructs us to determine whether Congress has spoken directly to the issue—that is, whether the statute in question is unambiguous. *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). If Congress's intent is clear from the statutory language, we must give effect to it. However, if the statute is silent or ambiguous, we proceed to the second step and defer to an agency's interpretation unless it fails the APA's "arbitrary and capricious" test. *Id.* at 844.

The petitioners contend that because the CAA is unambiguous, we need not reach the second step of the *Chevron* analysis. Even if we proceed to step two, however, they argue that we cannot uphold the Administrator's decision because his rationale does not purport to interpret the CAA but rather to implement an agency policy absent from and inconsistent with the CAA. The EPA, on the other hand, cautions that we should be especially mindful of the high level of deference an agency is owed when it interprets its own regulations. *See Barnhart v. Walton*, 535 U.S. 212, 217 (2002). It directs us to the relevant statutory language in the permit-objection process: "The Administrator shall issue an objection within such period if the petitioner demonstrates to the Administrator that the permit is not in compliance with the requirements of this Act . . . ." 42 U.S.C. § 7661d(b)(2). The EPA contends that "demonstrates" is an ambiguous term,

which the Administrator reasonably interpreted in denying the petitioners' claims.

Before turning to the merits, however, we must address the threshold jurisdictional question of whether the Illinois attorney general possesses standing to pursue this action.[5] Standing consists of three elements: (1) injury-in-fact, (2) causation, and (3) redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Because we are reviewing the decision of an administrative agency, which is not subject to Article III, the petitioner's burden of production on standing is the same as that of a plaintiff moving for summary judgment in the district court: she must support each element of her claim by affidavit or other evidence. *Sierra Club v. E.P.A.*, 292 F.3d 895, 899 (D.C. Cir. 2002). While in many cases a petitioner's standing is self-evident, when it is not, the petitioner must supplement the record to the extent necessary to establish her entitlement to judicial review at the first appropriate point in the proceeding. *Id.* at 899-900.

Here, however, the petitioners' opening brief devotes only one sentence to the issue of the attorney general's standing, simply stating that "[t]he People of the State of

---

[5] The EPA does not challenge the environmental groups' standing, therefore Article III's case-or-controversy requirement is satisfied. *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). However, as we previously noted, the environmental groups are only appealing the opacity issue, and their petition to object only concerns two of the six power plants. Thus, if we determine that the attorney general does not have standing, our review of the merits will be limited accordingly.

Illinois also have standing in this matter concerning all six Illinois coal plants." While the petitioners include a lengthier discussion in their reply brief, the EPA contends that this attempt to secure standing comes too late. We agree. It is improper for a party to raise new arguments in a reply because it does not give an adversary adequate opportunity to respond. Moreover, the attorney general's standing is far from self-evident because she is challenging permitting decisions made by the IEPA. Thus, we have a rather unusual antagonistic relationship between an office and an agency that are both part of the executive branch of the state of Illinois. Because standing was clearly going to be an uphill battle, the attorney general needed to substantiate her entitlement to judicial review at the earliest possible point. She failed to do so and accordingly has not met her burden of production.

Even if we take the petitioners' untimely arguments into consideration, we find an insufficient basis for standing. The petitioners assert that Illinois has standing as both a sovereign state and in a *parens patriae* capacity. They rely on *Davis v. United States E.P.A.*, 348 F.3d 772 (9th Cir. 2003), to support their argument for standing as a sovereign state. There, California Governor Gray Davis and the California Air Resources Board petitioned for review of an EPA order denying their request for a waiver of the oxygen level requirement under the federal reformulated gasoline program. The court found that California had standing because it "faces remedial and proprietary consequences that depend upon the outcome of this litigation." *Id.* at 778. In other words, California had an interest in the litigation because it was the direct recipient of the EPA's denial. Here, by contrast, the IEPA issued permits to Midwest, which were reviewed (but not objected

to) by the EPA. Thus, the EPA's actions were entirely consistent with Illinois' position, as advanced by the IEPA.

The petitioners also argue that Illinois has standing in a *parens patriae* capacity. A state may not bring a *parens patriae* suit against the federal government, however, because there the United States, and not the state, represents the people's interests. *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923); *Illinois Dep't of Transp. v. Hinson*, 122 F.3d 370, 373 (7th Cir. 1997). The petitioners respond by citing to *Massachusetts v. E.P.A.*, 127 S. Ct. 1438 (2007), a decision in which the Supreme Court allowed a challenge by Massachusetts to the EPA's decision not to regulate greenhouse gas emissions from motor vehicles. There, the Court drew a distinction "between allowing a State to protect her citizens from the operation of federal statutes (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)." *Id.* at 1455 n.17 (internal quotation marks omitted). But the Court also found that, according to the petitioner's uncontested affidavits, the rise in sea levels associated with global warming already harmed and would continue to harm Massachusetts "as a landowner." *Id.* at 1456. In other words, the alleged "injury" was to the state itself. Here, the alleged injury is unclear, as there are no supporting declarations in the record. And any general interests of the people of the State of Illinois would seem to be represented (at least informally)[6] by the IEPA.

---

[6] We say "informally" to distinguish this kind of representation from the authority to represent the State in litigation, which is possessed exclusively by the Illinois attorney general when the State is the only real party in interest. *See Scachitti v. UBS*

(continued...)

In sum, the attorney general has failed to explain why we have jurisdiction over an internal conflict between an office and an agency under the executive branch of the same state government. Under these circumstances, it seems appropriate for the governor, rather than the federal courts, to resolve the controversy; yet, there is no evidence that the state has taken any steps internally to change the IEPA's decision. The IEPA has the duty to make Title V permit decisions, so it appears to be the agency responsible for making Illinois policy in that arena. *See* 415 Ill. Comp. Stat. 5/4. And while the attorney general may have broad authority to protect public rights, which indicates that she has *capacity* to sue, *standing* must be independently established in every case. *See Bd. of Educ. of City of Peoria, Sch. Dist. No. 150 v. Ill. State Bd. of Educ.*, 810 F.2d 707, 709-10 (7th Cir. 1987). The attorney general has not met her burden of establishing standing in this case. Accordingly, we dismiss her petition for review and turn to the merits, examining only the environmental groups' challenge to the Administrator's decision not to object to the Fisk and Crawford permits.

Both parties think that the Court of Appeals for the Second Circuit's opinion in *New York Public Interest Research Group, Inc. v. Johnson*, 427 F.3d 172 (2d Cir. 2005) (*NYPIRG v. Johnson*), should inform our decision. There, New York's permitting authority issued an NOV to two power plants indicating that they had been modified without obtaining the required PSD permits. When the EPA did not object to the draft operating permits, NYPIRG petitioned it to do so. The EPA denied NYPIRG's peti-

---

[6] (...continued)
*Fin. Servs.*, 831 N.E.2d 544, 556 (Ill. 2005).

tion because (1) the source had not conceded that particular PSD limits applied; and (2) the permitting authority had discretion under Title V not to include in the permits PSD limits not yet determined to be applicable. The court of appeals, however, vacated the EPA's decision and held that the permitting authority's issuance of an NOV and commencement of a CAA citizen's suit "is a sufficient demonstration to the Administrator of non-compliance for purposes of the Title V permit review process." *Id.* at 180.

Not surprisingly, the petitioners encourage us to follow *NYPIRG v. Johnson* and find that the issuance of a subsequent NOV indicates that their petitions demonstrated noncompliance. The EPA, on the other hand, argues that we should not follow *NYPIRG v. Johnson* because its reasoning is flawed. As we see it, however, our case differs significantly from *NYPIRG v. Johnson* because the NOV here came *after* the Administrator's decision and therefore was not part of the record he reviewed.[7] Thus, even if we were prepared to embrace the rule in *NYPIRG v. Johnson,* it would not resolve the matter. For that reason, we reserve judgment on the question of whether a permitting authority's prior issuance of an NOV and the commencement of a citizen's suit obligates the Administrator to object to an operating permit.

---

[7] Our case also differs from *NYPIRG v. Johnson* because there the permitting authority issued the NOV, whereas here the NOV came from the EPA. *See id.* at 181 ("[W]e are not called on to determine whether it is reasonable for the EPA to exclude contested PSD limits from permits when the permitting authority has not yet determined those limits applicable—this case does not present that problem.").

To repeat, Title V states that "[t]he Administrator shall issue an objection . . . if the petitioner demonstrates to the Administrator that the permit is not in compliance with the requirements" of the CAA. 42 U.S.C. § 7661d(b)(2). This language clearly obligates the Administrator to (1) determine whether the petition demonstrates noncompliance and (2) object if such a demonstration is made. *N.Y. Pub. Interest Research Group v. Whitman*, 321 F.3d 316, 332-33 (2d Cir. 2003). As we mentioned, however, neither the CAA nor its regulations define the term "demonstrates." Thus, the EPA has discretion under the statute to determine what a petition must show in order to make an adequate "demonstration." *See id.* at 333 (discussing the distinction between "the discretionary part of the statute (whether the petition demonstrates noncompliance) with the nondiscretionary part (if such a demonstration is made, objection must follow)").

The petitioners, however, contend that the Administrator never really determined whether the petition demonstrated noncompliance but instead just deferred to the enforcement process. We disagree. While he noted several times that the EPA's policy was to give information that may indicate noncompliance to its enforcement arm, he also explicitly stated that "Petitioner has not demonstrated noncompliance at the time of permit issuance as required by the CAA . . . ." Thus, it is a bit of a stretch to argue that the Administrator failed to make the requisite threshold determination.

What the petitioners are really complaining about are the *reasons* the Administrator gave for his decision. On the opacity issue, the Administrator determined that a "demonstration" is not made when, among other things, alleged violations are contested by both the permitting authority and the source. The petitioners disagree. The

outcome therefore hinges on what is meant by the term "demonstrate." But because "demonstrate" is undefined, we need only determine whether the Administrator's interpretation is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.

Title V's time line indicates that the Administrator acted reasonably. To repeat again, permitting authorities must provide "streamlined" procedures for issuing permits. 40 C.F.R. § 70.4(d)(3)(ix). Within 45 days after receiving a copy of the proposed permit from the permitting authority, the Administrator must object if he determines that the permit is not in compliance with the CAA. 42 U.S.C. § 7661d(b)(1). If the Administrator does not object, any other person may petition him within 60 days after the expiration of the 45-day review period, and the agency is required to respond within 60 days. *Id.* § 7661d(b)(2). Thus, Congress deliberately gave the EPA a rather short time period to review proposed permits, resolve questions related to those permits, and decide whether to object. Because this limited time frame may not allow the EPA to fully investigate and analyze contested allegations, it is reasonable in this context for the EPA to refrain from extensive fact-finding.

The existence of the EPA's broad enforcement authority reinforces our belief that Congress did not intend the EPA to fully investigate and resolve all allegations in the permitting context. Section 113 states that, "on the basis of any information available," the EPA may find that any person has violated its requirements. *Id.* § 7413(a)(1). After contacting the source and the state, the EPA may issue an order, render an administrative penalty, or bring a civil action. *Id.* Section 114 allows the EPA to issue administrative information requests and to seek appropriate

relief, including civil penalties, if they are not answered. *Id.* §§ 7414(a)(1), 7413.

Moreover, Title V itself reserves the EPA's ability to bring an enforcement action for violations of the CAA unless an express "shield" on the face of the permit bars that action. *Id.* § 7661c(f). This provision would hardly be necessary if the EPA was supposed to resolve all alleged violations of the CAA in the permitting process. *See United States v. East Ky. Power Co-op., Inc.*, 498 F. Supp. 2d 1010, 1018 (E.D. Ky. 2007) (rejecting a defendant's argument that the Title V permitting process was "the only remedy available to the EPA for an alleged deficient permit application" because of the EPA's broad enforcement authority and the lack of a permit shield). In addition, unlike the permitting process, the enforcement process allows for discovery, hearings, cross-examination of witnesses, and expert testimony—mechanisms designed to resolve disputed claims. It is reasonable to interpret Title V to complement, not to limit, the EPA's enforcement authority.

Here, the Administrator's finding that the petitioners failed to demonstrate noncompliance regarding opacity was based on the fact that (1) the IEPA reviewed each source's opacity data and did not find a sufficient basis to include a compliance schedule in the permits; and (2) each source submitted a compliance certification.[8] Thus, he relied on representations made by the source and on the permitting authority's review when he deter-

---

[8] Certificates of compliance are not taken lightly. Filing a false compliance certification exposes the responsible corporate official and/or the source itself to potential criminal sanctions, among other things. 42 U.S.C. § 7413(c).

mined that the allegations were contested. This was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Allowing the Administrator to place some reliance on these factors is consistent with Title V's time lines and the complementary enforcement and permitting authorities established by Congress. Accordingly, we conclude that where, as here, there is contested evidence of a potential violation requiring further investigation and analysis, the CAA allows the EPA reasonable discretion to determine that the petition failed to demonstrate noncompliance and to refer the matter to the enforcement process.[9]

For the foregoing reasons, the attorney general's petitions for review (Nos. 07-3198 and 07-3199) are DISMISSED, and the environmental groups' petition for review (No. 07-3197) is DENIED.

---

[9] Contrary to the petitioners' assertions, this does not mean that a petition can *never* make an adequate demonstration of noncompliance. The EPA, in its brief, provided several examples of contexts in which petitioners will be able to make the required demonstration. And, to repeat, we have not decided whether a prior NOV issued by either the EPA or the permitting authority constitutes an adequate demonstration of noncompliance.