**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 11-4406
_____

UNITED STATES OF AMERICA


COMMONWEALTH OF PENNSYLVANIA,
DEPARTMENT OF ENVIRONMENTAL
PROTECTION;
STATE OF NEW YORK;
STATE OF NEW JERSEY,
(Intervenors in District Court)

v.

EME HOMER CITY GENERATION, L.P.;
HOMER CITY OL1, LLC;
HOMER CITY OL2, LLC; HOMER CITY OL3, LLC;
HOMER CITY OL4, LLC;
HOMER CITY OL5, LLC; HOMER CITY OL6, LLC;
HOMER CITY OL7, LLC;
HOMER CITY OL8, LLC; NEW YORK STATE
ELECTRIC AND GAS CORPORATION;
PENNSYLVANIA ELECTRIC COMPANY

United States of America,
                                Appellant

_____

Nos. 11-4407
_____

UNITED STATES OF AMERICA


COMMONWEALTH OF PENNSYLVANIA,
DEPARTMENT OF ENVIRONMENTAL
PROTECTION;
STATE OF NEW YORK;
STATE OF NEW JERSEY,
                    (Intervenors in District Court)

v.

EME HOMER CITY GENERATION, L.P.;
HOMER CITY OL1, LLC;
HOMER CITY OL2, LLC; HOMER CITY OL3, LLC;
HOMER CITY OL4, LLC;
HOMER CITY OL5, LLC; HOMER CITY OL6, LLC;
HOMER CITY OL7, LLC;
HOMER CITY OL8, LLC; NEW YORK STATE
ELECTRIC AND GAS CORPORATION


2

State of New York,
                            Appellant

_____

Nos. 11-4408
_____

UNITED STATES OF AMERICA


COMMONWEALTH OF PENNSYLVANIA,
DEPARTMENT OF ENVIRONMENTAL
PROTECTION;
STATE OF NEW YORK;
STATE OF NEW JERSEY,
                (Intervenors in District Court)

v.

EME HOMER CITY GENERATION, L.P.;
HOMER CITY OL1, LLC;
HOMER CITY OL2, LLC; HOMER CITY OL3, LLC;
HOMER CITY OL4, LLC;
HOMER CITY OL5, LLC; HOMER CITY OL6, LLC;
HOMER CITY OL7, LLC;
HOMER CITY OL8, LLC; NEW YORK STATE
ELECTRIC AND GAS CORPORATION
Commonwealth of Pennsylvania, Department of

3

Environmental Protection; State of New Jersey,
                                                     Appellants

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Court No. 2-11-cv-00019
District Judge: The Honorable Terrence F. McVerry

Argued May 15, 2013
Before:  SMITH, FISHER, and CHAGARES,
*Circuit Judges*

(Filed:   August 21, 2013)

David J. Hickton
Paul E. Skirtich
Office of United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA  15219

Robert J. Lundman          [ARGUED]
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7415
Washington, DC  20044

John Sither
L. Katherine Vanderhook-Gomez
United States Department of Justice
Environmental Enforcement Section
P.O. Box 7611
Ben Franklin Station
Washington, DC  20044
    *Counsel for Appellant United States of America*

Richard P. Dearing
Claude S. Platton            [ARGUED]
Monica B. Wagner
Office of Attorney General of the
State of New York
120 Broadway
25th Floor
New York, NY  10271

Michael Heilman
Commonwealth of Pennsylvania
Department of Environmental Resources
400 Waterfront Drive
Pittsburgh, PA  15222

Michael J. Myers
Office of Attorney General
of New York
Environmental Protection Bureau
The Capitol

5

Albany, NY  12224

Jon C. Martin
Office of Attorney General of New Jersey
Division of Law
Richard J. Hughes Justice Complex
P.O. Box 093
Trenton, NJ  08625

Lisa J. Morelli
Office of Attorney General
of New Jersey
Division of Law
25 Market Street
Richard J. Hughes Justice Complex
Trenton, NJ  08625
        *Counsel for Appellants*

Stephen J. Bonebrake
Andrew N. Sawula
Schiff Hardin
233 South Wacker Drive
6600 Sears Tower
Chicago, IL  60606

Kevin P. Holewinski
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC  20001

James J. Jones
Rebekah B. Kcehowski
Jones Day
500 Grant Street
Suite 4500
Pittsburgh, PA  15219

Brian J. Murray
Jones Day
77 West Wacker Drive
Suite 3500
Chicago, IL  69601

Beth M. Kramer
Jeffrey Poston
Chet M. Thompson          [ARGUED]
Crowell & Moring
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004

Peter T. Stinson
W. Alan Torrance
Dickie, McCamey & Chilcote
Two PPG Place
Suite 400
Pittsburgh, PA  15222

John P. Elwood          [ARGUED]

Kevin A. Gaynor
Benjamin S. Lippard
Jeremy C. Marwell
Vinson & Elkins
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, DC  20037

Paul D. Clement
David Z. Hudson
Bancroft
1919 M Street N.W.
Suite 470
Washington, DC  20036

Paul E. Gutermann
Akin, Gump, Strauss, Hauer & Feld
1333 New Hampshire Avenue N.W.
Suite 400
Washington, DC  20036
          *Counsel for Appellees*

————————————

OPINION

————————————

SMITH, *Circuit Judge.*

8

The owners of a coal-fired power plant failed both to obtain a preconstruction permit and to install certain pollution-control technology before making changes to the plant. The Environmental Protection Agency and several states say the owners were required to do so. But the EPA[1] did not cry foul until more than a decade after the changes, well after the owners had sold the plant. Now the EPA wants to force the former owners to obtain the missing preconstruction permit and to install the missing pollution controls on a plant they no longer own or operate. And they seek damages and an injunction against the current owners who neither owned nor operated the plant when it was allegedly modified illegally. The relief now sought would require us to distort plain statutory text to shore up what the EPA views as an incomplete remedial scheme. That we cannot do, and so we will affirm the District Court's dismissal of their claims.

---

[1] For readability, "the EPA" refers to both the EPA and the states unless otherwise specified.

# I.

## A.  The Homer City Generation Power Plant goes online in 1969, and Congress enacts the Clean Air Act.

In the 1960s, the Pennsylvania Electric Company (Penelec) and the New York State Electric & Gas Corporation (NYSEG) built the Homer City Generating Station ("the Plant"), a coal-burning power plant in Indiana County, Pennsylvania.  JA66.  The Plant's first two burners went online at the end of the decade. *Id.* At that time, the Clean Air Act was little more than a federally funded research program on air pollution, the EPA did not exist, and the few enforceable standards in place did not affect the Plant's construction and operation. *See* Air Quality Act of 1967, Pub. L. No. 90-148, 81 Stat. 485–507 (expanding studies into air pollutants, emissions, and control techniques); Clean Air Act Amendments of 1966, Pub. L. No. 89-675, 80 Stat. 954–55; Clean Air Act of 1963, Pub. L. No. 88-206, 77 Stat. 392–401; Air Pollution Control Act of 1955, Pub. L. No. 84-159, 69 Stat. 322 (providing funds for federal research into air pollution).

**B.** **Congress enacts the Clean Air Act, which grandfathers pre-existing pollution sources (like the Plant) out of its requirements until they are "modified."**

> ### *1.* *The Clean Air Act of 1970 sets up the modern federalism-based framework.*

While the Plant ramped up operations over the next two decades, Congress enacted three amendments to the Clean Air Act transforming it into the comprehensive regulatory scheme it is today. It is necessary, then, to take a minor detour through those legislative changes.

These amendments reach back to 1970 when Congress converted the Act from a federal research program on air pollution into the federalist enforcement framework still in place today. Clean Air Act of 1970, Pub. L. No. 91-604. The 1970 version charged the soon-to-be[2] EPA with setting national maximum permissible levels of common pollutants for any given area—called National Ambient Air Quality Standards, or NAAQS (pronounced "knacks"). *See* 42 U.S.C. § 7409(a)–(b)

---

[2] President Nixon did not create the EPA until later in 1970 after Congress declared a national environmental policy. *See* National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4347. Before the EPA, federal environmental responsibilities were decentralized among various executive agencies.

11

(requiring the EPA to choose levels that "allow[] an adequate margin of safety" required "to protect the public health" (quoting 42 U.S.C. § 7409(b)(1)). The EPA designates "nonattainment" areas within each state where a regulated pollutant levels exceeds the NAAQS (so called because the areas are not attaining the EPA's standards). 42 U.S.C. § 7407(d).

The states then take primary responsibility (if they want it[3]) for choosing how to meet the NAAQS within their borders. *See Train v. Natural Res. Def. Council, Inc.*, 421 U.S. 60, 63–67 (1975). They do so by creating State Implementation Plans, or SIPs. In their SIPs, states "choose which individual sources within [their borders] must reduce emissions, and by how much." *EME Homer City Generation L.P. v. EPA*, 696 F.3d 7, 13 (D.C. Cir. 2012). For instance, a state "may decide to impose different emissions limits on individual coal-burning power plants, natural gas-burning power plants, and other sources of air pollution, such as factories, refineries, incinerators, and agricultural activities." *Id.* A state must submit its SIP to the EPA for review and approval whenever the NAAQS are updated, *see* 42 U.S.C. § 7410(a)(1), and each SIP must meet certain requirements, *see id.* §§ 7410(a)(2), 7471.

---

[3] If a state refuses to participate, the EPA takes over and regulates pollution sources directly. *EME Homer City Generation, L.P. v. EPA*, 696 F.3d 7, 12 (D.C. Cir. 2012).

12

### 2. The 1977 amendments create the Prevention of Significant Deterioration (PSD) pre-construction permit program.

The 1970 framework merely prevented pollution sources from exceeding the NAAQS. It did not prevent new construction or modifications that would "gray out" areas with clean air as long as the pollution did not exceed the NAAQS. *See* Craig N. Oren, *Prevention of Significant Deterioration: Control-Compelling Versus Site-Shifting*, 74 Iowa L. Rev. 1, 9 (1988). At least that was the consensus before federal courts interpreted the Clean Air Act as requiring the EPA to "prevent deterioration of [the nation's] air quality, no matter how presently pure that quality in some sections of the country happens to be." *Sierra Club v. Ruckelshaus*, 344 F. Supp. 253, 255 (D.D.C. 1972), *aff'd*, 41 U.S.L.W. 2255 (D.C. Cir. Nov. 1, 1972) (per curiam), *aff'd by an equally divided court sub nom. Fri v. Sierra Club*, 412 U.S. 541 (1973) (per curiam) (Powell, J., recused). To enforce that interpretation, Congress created a program for reviewing the effect of new pollution sources on existing air quality before they are constructed. Oren, *Prevention of Significant Deterioration*, 74 Iowa L. Rev. at 10.

Congress divided this aptly named New Source Review program into two permit programs. For areas with unclean air—called "nonattainment" areas because they are not attaining the NAAQS—the Nonattainment

New Source Review program ensures that new emissions will not significantly hinder the area's progress towards meeting the NAAQS. For areas with clean air—"attainment" areas—the Prevention of Significant Deterioration (PSD) program ensures that any new emissions will not significantly degrade existing air quality.[4] The PSD program stands at the center of this case.

The PSD program requires operators of pollution sources in attainment areas to obtain a permit from the state or the EPA before constructing or modifying a "major emitting facility" (which emits significant air pollution even with pollution controls installed). *See* 42 U.S.C. §§ 7475(a) (setting permitting requirements), 7479(1) (defining "major emitting facility"). This "case-by-case" permitting process "tak[es] into account energy, environmental, and economic impacts and other costs," 40 C.F.R. § 52.21(b)(12); 42 U.S.C. §§ 7479, 7602(k), to determine the "best available control technology"

---

[4] These programs are not necessarily mutually exclusive. It is possible for the same area to be classified as a nonattainment area for some pollutants and as an attainment area for others. *See, e.g.*, *United States v. DTE Energy Co.*, 711 F.3d 643, 644 n.1 (6th Cir. 2013) (noting that Monroe, Michigan, "falls into both categories depending on the pollutant").

(BACT)[5] for controlling every regulated pollutant at the facility to a specified limit, 42 U.S.C. § 7475(a)(4).[6] In keeping with the Clean Air Act's federalist framework, Congress required states to implement the PSD program in their SIPs. *See* 42 U.S.C. § 7410(a)(2)(D)(i)(II), (a)(2)(J).

---

[5] BACT is something of a misnomer. It does not refer to any specific technology, but rather to a specified emissions limit for each pollutant that reflects which pollution-control technology will be used. *See* 40 C.F.R. § 52.21(b)(12) (defining BACT as an "emissions limitation" based on the "maximum degree of reduction for each [regulated] pollutant" that "would be emitted from any proposed major stationary source or major modification").

[6] For comparison, BACT is not the only standard used in the Clean Air Act. In nonattainment areas, sources are required to attain the lowest achievable emission rate (LAER). *See* 42 U.S.C. § 7503; *Citizens Against Ruining the Environment v. EPA*, 535 F.3d 670, 674 n.3 (7th Cir. 2008). At least in theory, LAER is a stricter standard than BACT. Whereas BACT factors in a limited cost-benefit analysis, LAER requires sources to use whatever technology achieves the lowest emission rate contained in a SIP or possible in practice, regardless of costs. *See* 42 U.S.C. §§ 7501(3), 7503(a)(2). As a result, determining LAER for any particular pollutant does not require a case-by-case determination, unlike BACT.

15

### 3. The 1990 amendments add an operating-permit program.

Such was the Clean Air Act until 1990. That year, Congress passed its third and latest round of major amendments. In addition to other practical problems that arose after the 1977 amendments, citizens, regulators, and even the owners and operators of pollution sources had difficulty knowing which of the Clean Air Act's many requirements applied to a particular pollution source. *Sierra Club v. Johnson (Sierra Club 11th Cir.)*, 541 F.3d 1257, 1261 (11th Cir. 2008); Hon. Henry A. Waxman, *An Overview of the Clean Air Act Amendments of 1990*, 21 Envtl. L. 1721, 1747 (1991). After all, the only requirements easily discoverable were those expressly listed in the preconstruction permits issued under the New Source Review program; any other applicable requirements under the Clean Air Act were scattered among separate records, permits, and other documents, if they were recorded at all. *Sierra Club 11th Cir.*, 541 F.3d at 1261; Waxman, *An Overview of the Clean Air Act Amendments of 1990*, 21 Envtl. L. at 1747.

Congress fixed that problem by enacting Title V. *See* Operating Permit Program, 57 Fed. Reg. at 32,351 (explaining that Title V's goals are "[i]ncreased source accountability and better enforcement"). Title V "requires all major sources of air pollution to obtain operating permits" that "'consolidate into a single document (the operating permit) all of the clean air

16

requirements applicable to a particular source of air pollution.'" *Sierra Club 11th Cir.*, 541 F.3d at 1260 (quoting *Sierra Club v. Ga. Power Co.*, 443 F.3d 1346, 1348–49 (11th Cir. 2006)); *see* Pub. L. No. 101-549, §§ 501–02, 104 Stat. 2399, 2635–36 (codified at 42 U.S.C. § 7661a(a)). Title V "does not generally impose new substantive air quality control requirements," *Sierra Club 11th Cir.*, 541 F.3d at 1260, but does require the source to obtain an operating permit that "assures compliance . . . with all applicable requirements," 40 C.F.R. § 70.1(b). Among the many requirements included in an operating permit are PSD emission limits (if applicable). *Sierra Club 11th Cir.*, 541 F.3d at 1260. As with the PSD program, Title V's operating permit program became a required element of SIPs. *See* 42 U.S.C. § 7661a.

## C. Penelec and NYSEG modify the Plant during the 1990s but do not apply for a PSD permit, though they later apply for a Title V permit.

None of these comprehensive reforms initially affected the operation of the Homer City Generation Power Plant by Penelec and NYSEG. Congress had grandfathered pre-existing pollution sources, including the Plant, out of the PSD requirements "until those sources [we]re modified in a way that increases pollution." *Sierra Club 11th Cir.*, 541 F.3d at 1261; *see also United States v. Cinergy Corp.*, 458 F.3d 705, 709 (7th Cir. 2006).

17

But the Plant's sidelined status came to a halt in the 1990s. In 1991, 1994, 1995, and 1996, Penelec and NYSEG allegedly made various changes to the Plant's boilers that increased net emissions of sulfur dioxide and particulate matter.[7] Those changes were allegedly "major modifications" triggering the PSD permitting requirements and requiring the use of BACT. JA66-67, 81-82, 84-85. But at the time, Penelec and NYSEG believed their changes were "routine maintenance" exempted from the PSD program. Oral Arg. Tr. at 36:5–11; *see* 40 C.F.R. § 60.14(e)(1) ("The following shall not, by themselves, be considered modifications under this part: (1) Maintenance, repair, and replacement which the Administrator determines to be routine for a source category . . ."). So they did not apply for a PSD permit and instead continued to operate the modified Plant as though it were still exempt from the PSD program and BACT-based emissions controls. In 1995, Penelec and NYSEG applied for an operating permit as required by Title V. Because they never received a PSD pre-modification permit containing BACT-based emissions limits for the Plant their Title V operating permit application did not include any PSD-based requirements or BACT-based emissions limits. JA83–84, 86–87.

---

[7] These modifications included replacing economizers, modifying ductwork, and installing new reheat temperature-control dampers and internal boiler supports. JA66–67, 81–82, 84–85.

18

**D. EPA announces an "unprecedented" initiative to enforce the Clean Air Act. Meanwhile, the Former Owners sell the Plant to the Current Owners, after which Pennsylvania approves the Plant's Title V permit.**

While Penelec and NYSEG waited for Pennsylvania and the EPA to issue its Title V operating permit, the EPA rolled out a new enforcement initiative that eventually ensnared the Plant's operations. In 1999, the EPA "jointly announced what they called an 'unprecedented action'"—civil enforcement actions against seven electric utility companies and the Tennessee Valley Authority for Clean Air Act violations dating back more than twenty years at thirty-two power plants across ten states. Margaret Claiborne Campbell & Angela Jean Levin, *Ten Years of New Source Review Enforcement Litigation*, 24 Nat. Resources & Env't 16 (2010). That action was merely the first in what would become "the largest, most contentious industry-wide enforcement initiative in EPA history" to retroactively target violations of the New Source Review program:

> [A]ll involve virtually identical allegations. In each case, EPA alleges that the replacement of parts, typically boiler components or portions or components, at existing electric generating units amounted to "major modifications" of those units, triggering new source permitting and

19

> regulatory requirements. According to EPA, failure to obtain preconstruction permits constitutes a continuing violation, rendering ongoing operation of the units unlawful.

*Id.*

The same year as the EPA's announcement, Penelec and NYSEG sold the Plant to EME Homer City Generation, L.P. Two years later, EME Homer City needed to raise capital, so it entered a sale-leaseback transaction with Homer City Owner-Lessors 1 through 8 ("Homer City OLs"): EME Homer City sold the Plant to the Homer City OLs, who simultaneously leased it back to EME Homer City. As a result, Penelec and NYSEG became the former owners and operators ("Former Owners"), and EME Homer City and the Homer City OLs became the current owners and operators ("Current Owners"). Despite these transfers, no one sought a PSD permit or installed BACT.

In 2004, the Pennsylvania Department of Environmental Protection finally approved the Title V permit application (for which the Former Owners had applied nine years earlier) and issued the Title V permit to the Current Owners. JA80. Because there was no PSD permit, the issued Title V permit did not include any PSD requirements or BACT requirements.

**E.  In 2011, as part of that initiative, the EPA and the States sue the Former and Current Owners.**

By 2004, the Plant had become "one of the largest air pollution sources in the nation," annually releasing nearly 100,000 tons of sulfur dioxide, which "contribut[es] to premature mortality, asthma attacks, acid rain, and other adverse effects in downwind communities and natural areas." JA67. With its pollution catching the EPA's attention, the Plant became a target of the agency's new enforcement initiative.

In 2008, the EPA notified the Current and Former Owners of their alleged violations (as required by the Clean Air Act) before eventually suing them in the Western District of Pennsylvania in January 2011.[8] According to the EPA, the Former Owners had violated (1) the PSD program by *modifying* the Plant without a PSD permit and without installing BACT-based emissions controls before modifying the Plant and (2) Title V by submitting an incomplete operating-permit

---

[8] This three-year gap between the notice of violations and the lawsuit is not abnormal. The notice-of-violation requirement, tracking the federalism-based structure of the rest of the Clean Air Act, affords states the opportunity to take the lead in enforcement by giving the alleged violators an opportunity to negotiate a solution to the violations with their states. The EPA's enforcement authority is a backstop.

application that omitted the Plant's modifications and proposed BACT controls. The Current Owners, on the other hand, had allegedly violated (1) the PSD program by *operating* the Plant after it had been modified without BACT controls installed or a PSD permit and (2) Title V by operating in accordance with their facially valid but inadequate operating permit (inadequate because it failed to include any of the applicable PSD permit requirements or require the use of BACT). JA81–83, 84–86. The EPA sought injunctive relief against the Former and Current Owners as well as civil penalties against the Current Owners for their past five years of operation. JA88–89.[9]

That was only the beginning. New York, New Jersey, and the Pennsylvania Department of Environmental Protection filed motions to intervene as plaintiffs, which the District Court granted. *See* JA91–130, 195–223. These States alleged the same violations

---

[9] Because the Clean Air Act does not contain a statute of limitations, the general federal five-year statute of limitations applies to any claim for civil penalties. *See* 28 U.S.C. § 2462 (establishing a general five-year statute of limitations for "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise"). The EPA did not seek civil penalties from the Former Owners because the five-year statute of limitations for civil penalties had expired. JA82–89.

22

as the EPA[10] and raised state-law claims that concededly rise or fall with the federal claims.

The Former and Current Owners moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. The District Court granted that motion in its entirety and dismissed the EPA's claims in October 2011. *See* JA6. In a nutshell, the District Court held that the five-year statute of limitations had expired on the civil-penalty PSD claims against the Current Owners because the PSD program imposes only prerequisites to construction and modification, not ongoing conditions of operation. And because the Current Owners were not the ones to modify the Plant, they could not be liable for violating the PSD requirements and thus injunctive relief was also unavailable against them. The District Court also declined to enjoin the Former Owners because they no longer owned or operated the Plant and thus posed no risk of violating the PSD program in the future. JA28–32.

---

[10] The States' allegations differed from the EPA's in only one respect: according to the States, the Former Owners modified the Plant (and thus triggered the PSD requirements) not only in 1991 and 1994 as alleged by the EPA, but also in 1995 and 1996. As all the parties agree, this difference is irrelevant to our analysis.

23

As to the Title V operating permit claims, the Current Owners could not be liable because Title V does not transform the PSD requirements into operating duties and does not permit a collateral attack on a facially valid permit. JA32–36. Likewise, the Former Owners could not be held liable because all that Title V prohibits is operating a source out of compliance with the operating permit. The Former Owners never owned or operated the Plant after the Title V permit was issued. JA32.

The EPA and States appealed.[11]

---

[11] Because the EPA's and States' PSD claims arise under federal law, the District Court had federal-question jurisdiction under 28 U.S.C. § 1331. *See Landsman & Funk PC v. Skinder-Strauss Assocs.*, 640 F.3d 72, 82 n.8 (3d Cir. 2011) (explaining that federal-question jurisdiction under § 1331 extends only to "cases 'in which a well-pleaded complaint establishes either [1] that federal law creates the cause of action or [2] that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.'" (quoting *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 28 (1983))). Given those federal anchor claims, the District Court had supplemental jurisdiction under 28 U.S.C. § 1367 over the state-law claims. Because the District Court's order dismissing the EPA's and States' claims was a final order, we have appellate jurisdiction under 28 U.S.C. § 1291. As we

24

## II.

The EPA asks us to reverse the District Court's dismissal of its PSD preconstruction-permit claims and Title V operating-permit claims against the Former and Current Owners. We will affirm the District Court's dismissal in its entirety.

### A. PSD Claims

#### 1. Against the Current Owners

The EPA contends that the Current Owners violated the PSD program by operating the Plant while failing to use BACT and satisfy the PSD requirements. As relief, the EPA seeks $37,500 (the maximum daily civil penalty[12]) for each day that the Current Owners

---

explain in Part II.B, however, the District Court lacked jurisdiction over the EPA and States' Title V claims.

[12] Although the statute sets the maximum civil penalty at $25,000 "per day for each violation," 42 U.S.C. § 7413(b), Congress has since directed each federal agency to regularly adjust for inflation statutory civil penalties that can be imposed under laws it administers. Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 note, *amended by* Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701 note. Effective after January 12, 2009, the inflation-adjusted

25

operated the Plant for the five years preceding this lawsuit (the statute of limitations for civil penalties). They also want a permanent injunction ordering the Current Owners to obtain a PSD permit and install BACT.

The District Court dismissed these claims, reasoning that failure to comply with the PSD program is a one-time violation that occurs only at the time of construction or modification (here, 1996 at the latest). Consequently, it concluded that the Current Owners did not violate the PSD program because they did not modify the Plant; the Former Owners did.[13]  But if, as the EPA

maximum daily civil penalty under the Clean Air Act is $37,500.  40 C.F.R. § 19.4.

[13] The EPA does not argue that the Clean Air Act imposes successor liability on the Current Owners for the Former Owners' alleged violation of the PSD Program. *Compare* 42 U.S.C. § 7413(b) (authorizing the EPA to enforce the Clean Air Act against a "person that is the owner or operator" of a "major emitting facility" only if "*such person*" has committed a violation (emphasis added)), *with* 42 U.S.C. § 9607(a) (providing a list of "persons"—explicitly including current owners or operators and any person who owned or operated the facility when the hazardous substances were disposed— who can be held liable under the Comprehensive Environmental Response, Compensation and Liability

urges, the PSD program imposes operating duties, then a new violation occurs each day that the Current Owners operated the Plant without BACT or a PSD permit (subject, of course, to the five-year statute of limitations). The claims against the Current Owners thus rise or fall on the answer to a single question: Does the PSD program prohibit operating a facility without BACT or a PSD permit?

We agree with the unanimous view of the other courts of appeals that have addressed this question. The PSD program's plain text requires the answer be "no." Under 42 U.S.C. § 7475(a), "[n]o major emitting facility . . . may be constructed [or modified[14]] . . . unless" it meets various PSD requirements, including obtaining a PSD permit and installing BACT-based emission controls. That provision prohibits "construct[ing]" a facility without obtaining a PSD permit or using BACT, and while "construction" is defined to include

Act (CERCLA) for remediation costs). Nor does the EPA argue that the Former Owners' liability under the Clean Air Act was transferred to the Current Owners as part of the Plant's sale.

[14] Although § 7475(a) refers only to construction, the Clean Air Act defines construction as including modification of an existing pollution source. 42 U.S.C. § 7479(2)(C); *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 568 (2007).

"modifications," *see* 42 U.S.C. § 7479(2)(C), it does not include "operation." And § 7475(a) does not exactly try to hide its exclusive link to construction and modification: after all, the section is titled "Preconstruction Requirements"—not "Preconstruction and Operational Requirements." In short, "[n]othing in the text of § 7475 even hints at the possibility that a fresh violation occurs every day until the end of the universe if an owner that lacks a construction permit operates a completed facility." *United States v. Midwest Generation, LLC*, 720 F.3d 644, 647 (7th Cir. 2013); *see also Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1015 (8th Cir. 2010) (agreeing with the Eleventh Circuit that operating a modified facility without a PSD permit is simply "not articulated as a basis for a violation" (quoting *Nat'l Parks & Conservation Ass'n v. Tenn. Valley Auth.* (*Nat'l Parks 11th Cir.*), 502 F.3d 1316, 1323 (11th Cir. 2007))). Instead, "[t]he violation is complete when construction [or modification] commences without a permit in hand." *Midwest Generation, LLC*, 720 F.3d at 647.

Section 7475's omission of any reference to "operation" takes on dispositive significance given that other parts of the Clean Air Act establish operational conditions by "employing plain and explicit language." *Otter Tail Power Co.*, 615 F.3d at 1015. Two examples suffice: 42 U.S.C. § 7411(e) makes it "unlawful . . . to operate" a facility in violation of New Source

28

Performance Standards. Title V similarly prohibits any person from "operat[ing]" a source "except in compliance with a [Title V operating] permit" and notes in the very next sentence that nothing in Title V "shall be construed to alter the applicable requirements of [the PSD program] that a permit *be obtained before construction or modification*." 42 U.S.C. § 7661a(a) (emphasis added). Congress's choice to explicitly refer to operating conditions elsewhere, but not in § 7475(a), can only be deliberate, especially in such comprehensive legislation. *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) ("When Congress includes particular language in one section of a statute but omits it in another section . . . , it is generally presumed that Congress acts intentionally and purposely[.]" (internal quotation marks and citations omitted)). We cannot override that choice. *See Otter Tail Power Co.*, 615 F.3d at 1015 ("Where Congress has intended to establish operational conditions under the Clean Air Act, it has clearly said so. But it has not done so for the PSD program.").

The PSD program's enforcement provisions confirm this. The EPA and States can "take such measures . . . as necessary *to prevent* the construction or modification" of a source to which the PSD requirements apply. 42 U.S.C. § 7477 (emphasis added). The Act authorizes citizen suits "against any person who *proposes to construct* or *constructs*" (or, by definition, proposes "to modify or modifies") a facility without a required

PSD permit or violates any condition of a PSD permit. 42 U.S.C. § 7604(a)(3) (emphasis added). Nowhere do these provisions authorize enforcement against a person who "operates" a source without satisfying applicable PSD requirements.[15]

---

[15] The EPA relies on an isolated piece of legislative history from the 1990 amendments to show that Congress intended to authorize the EPA to prevent sources from operating out of compliance with the PSD requirements. In 1990, the EPA's enforcement authority under 42 U.S.C. § 7477 authorized it to "take such measures . . . as necessary to prevent the construction" of a source violating the PSD requirements. As part of the 1990 changes, Congress considered and rejected a Senate amendment that would have added the terms "operation" and "modification" such that § 7477 would have authorized the EPA to "take such measures . . . as necessary to prevent the construction, operation, or modification of a major emitting facility." S. Rep. No. 101-228, at 376 (1989), reprinted in 1990 U.S.C.C.A.N. 3385, 3759. Instead, Congress adopted a House amendment that added the term "modification" but not the term "operation." H.R. Rep. No. 101-490(I) § 609 (1990), reprinted in 1990 WL 258792, at *178. That amendment gave § 7477 its current form, which authorizes the EPA to "take such measures . . . as necessary to prevent the construction or modification" of

30

a source violating the PSD requirements.  In explaining this choice, the Conference Report stated that the House amendment

> recognizes existing law which allows EPA to initiate enforcement actions against sources that are being constructed or modified in violation of new source requirements, *and leaves intact the current interpretation of the Agency that allows action against sources that are operating in violation of new source requirements.*

136 Cong. Rec. 36007, 36086 (Oct. 27, 1990) (Chaffee-Baucus Statement of Senate Managers, S. 1630, The Clean Air Act Amendments of 1990) (emphasis added).

The EPA considers this statement proof that Congress deliberately omitted "operation" from the EPA's § 7477 enforcement authority because it believed the EPA "already ha[d] that authority," not to eliminate such authority.  Oral Arg. Tr. at 12:15–20.  But proof it is not.  As is always the case with Congress's rejection of an amendment, its meaning is elusive.  Perhaps Congress rejected the amendment because it disagreed with the amendment's legal directive and did not want to adopt that directive as law.  *See Doe v. Chao*, 540 U.S. 614, 622 (2004) ("This [interpretation] is underscored by drafting history showing that Congress cut out the very

31

The EPA responds by identifying other provisions that purport to turn the PSD requirements into operational conditions. It points to § 7604(a)(1), which authorizes citizen suits for violations of "an emission standard or limitation," which is defined to include "any requirement to obtain a permit as a condition of

---

language in the bill that would have authorized any presumed damages."). Equally as likely, however, is that Congress rejected the amendment agreeing with the legal principle in the amendment but believing that the amendment was unnecessary because the statute already expressed that principle. Here, the situation is even murkier because Congress enacted the 1990 amendments under the assumption that all sources would receive a required PSD permit before construction or modification began. *See infra* discussion at pp. 31–32. Therefore, Congress's otherwise-absolute statement might reflect a narrower belief that the EPA could enforce the PSD requirements against sources operating in violation of their PSD permit—an uncontroversial proposition. Given the statute's clarity, we need not try to recreate what the Conference Report meant by this statement. *See Marx v. Gen. Revenue Corp.*, 133 S. Ct. 1166, 1172 (2013) ("[W]e assum[e] that the ordinary meaning of [the statutory] language accurately expresses the legislative purpose." (internal quotation marks and citations omitted)).

32

operations," 42 U.S.C. § 7604(f)(4). But § 7604(a)(1) merely creates a private cause of action against a person who is required to (but does not) obtain a permit as a condition of operations. It does not say that a PSD permit is, in fact, a condition of operations.

The EPA takes the next logical step, arguing that obtaining a PSD permit—and not just the PSD requirements themselvse—is itself a condition of operations, notwithstanding all the plain text to the contrary. The agency's argument is simple: obtaining a PSD permit is a condition of operating a source because PSD permits impose some operational conditions on the sources they govern. For example, § 7475(a)(1) requires the permit to "set[] forth emission limitations" that will govern post-construction operation. Subsection (a)(4) requires that the source be subject to BACT-based emission controls. And subsection (a)(7) sets ongoing monitoring requirements during post-construction operation.

But Ockham's Razor reminds us that simplicity in argument, without more, is no barometer of merit. As the Eighth Circuit explained, "[e]ven though the preconstruction permitting process may establish obligations which continue to govern a facility's operation after construction, that does not necessarily mean that such parameters are enforceable independent of the permitting process." *Otter Tail Power Co.*, 615 F.3d at 1017. In other words, just because the PSD

33

program requires a source to obtain a permit that sets some operating conditions does not mean that the PSD program requires a source without a permit to comply with operating conditions. Indeed, even the EPA's own regulations distinguish between unlawful modifications and unlawful operations:

> Any owner or operator who *constructs or operates* a source or modification *not in accordance with the [PSD] application . . . or with the terms of any approval to construct*, or any owner or operator of a source or modification . . . who *commences construction . . . without applying for and receiving approval* [under the PSD program], shall be subject to appropriate enforcement action.

40 C.F.R. § 52.21(r)(1) (emphasis added). Had the EPA wanted to make operating without a required PSD permit unlawful, the last half of this regulation would use the term "operates" just like the first half does: "any owner or operator of a source or modification . . . who commences construction *or operates a source or modification* without applying for and receiving approval [under the PSD program]." But the regulation does not say that.

Alternatively, the EPA argues that § 7475(a) is merely a rule of timing that starts the PSD permitting

34

requirements at the time of construction or modification. Yet § 7475(a) does not say that "a violation starts when a major emitting facility is constructed or modified without" meeting the PSD requirements. Rather, § 7475(a) prohibits modifying and constructing facilities without satisfying the PSD requirements. More to the point, this timing argument is just a repackaging of its contention that § 7475(a) imposes operational conditions.

Similar reasons doom the EPA's argument that BACT is a freestanding requirement that applies to operating sources regardless of whether a source obtains a PSD permit before construction or modification. For this proposition, the EPA quotes § 7475(a)(4)'s statement that a "proposed facility *is subject* to the best available control technology for each [regulated] pollutant" (emphasis added). That present-tense language might seem to create an ongoing obligation to use BACT regardless of a PSD permit's terms or existence. Except that the subsection says more than the language EPA quotes. Under § 7475(a)(4), "[n]o major emitting facility . . . may be constructed . . . unless (4) the proposed facility is subject to the best available control technology for each [regulated] pollutant." The BACT requirement is simply part of § 7475's prohibition on construction— not operation. Otherwise, § 7475(a)(4) would declare that "[n]o major emitting facility . . . may be constructed *or operated* . . . unless (4) the proposed facility is subject to" BACT. As is, though, the BACT requirement is "not

35

a freestanding [operational] requirement." *Otter Tail Power Co.*, 615 F.3d at 1016. And as the Seventh Circuit illustrated, it would not violate § 7475 even "[i]f the owners ripped out or deactivated the best available control technology after finishing construction," (though it might violate some other law). *Midwest Generation, LLC*, 720 F.3d at 647; *see Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 484 (2004) (describing subsections (a)(1) and (a)(4) as creating an "express preconstruction requirement" to include "a BACT determination in a facility's PSD permit").

Even if we take the EPA's argument on its own terms and ignore the construction limitation preceding subsection (4), the argument ignores the word "proposed." 42 U.S.C. § 7475(a)(4). After all, if the BACT requirement is interpreted as a freestanding requirement separate from the PSD permitting process, then facilities that never obtained PSD permits would have to apply BACT as a condition of operations after construction is completed. But if construction is completed, then the facilities are no longer "proposed" facilities, making that word meaningless. *See Corley v. United States,* 556 U.S. 303, 314 (2009) ("[O]ne of the most basic interpretive canons [is] that [a] statute should be construed . . . so that no part will be inoperative or superfluous, void or insignificant." (internal quotation marks and citations omitted)). Subsection (4) is no more than a congressional mandate to require constructed and

36

modified facilities in attainment areas to use BACT rather than an alternative emissions standard—such as the more-stringent lowest achievable emission rate (LAER), which does not require a cost-benefit analysis and applies to nonattainment areas exceeding the NAAQS.

Apart from any issue of statutory interpretation, a freestanding BACT requirement would not survive in the real world. BACT determinations are products of the permitting process, "tailored to each facility 'on a case-by-case basis'" using cost-benefit analysis specific to each pollution source. *Otter Tail Power Co.*, 615 F.3d at 1017 (quoting 42 U.S.C. § 7479(3)); *see also* 40 C.F.R. § 52.21(b)(12) (similar). There is no statutory or regulatory provision (outside of some individual states' SIPs) for obtaining a BACT determination outside of the PSD permitting process. Without an issued PSD permit, there are no BACT emission limits to violate. Tellingly, the EPA cannot explain what the BACT limits are for the Plant in this case because the permitting process has not occurred. *See* U.S. Reply Br. at 10 ("BACT is typically specified during the permitting process. . . . [But] the precise BACT standard for a particular source need not be pre-determined for an operator to violate the BACT obligation.").

Without supporting statutory text, the EPA falls back on (and the States primarily rely upon) policy arguments. Given the clarity of the statute, these

37

concerns have no place in the process of statutory interpretation. *Rodriguez v. United States*, 480 U.S. 522, 526 (1987) ("Where, as here, the language of a provision . . . is sufficiently clear in context and not at odds with the legislative history, . . . [there is no occasion] to examine the additional considerations of policy that may have influenced the lawmakers in their formulation of the statute." (alterations in original) (internal quotation marks and citations omitted)). But lest one be concerned that the EPA's parade of horribles may come to pass, such fears are inflated. First, it is not true that "a company that modifies a facility without obtaining a PSD permit or installing [BACT] pollution controls would be subject to a maximum total penalty of [only] $37,500" (the maximum daily fine). U.S. Br. at 46; States Br. at 60. Like Rome, facilities are not built—or modified—in a day. It is possible that the maximum daily fine accrues each day the owner or operator spends modifying or constructing the facility—from the beginning of construction to the end of construction. An owner or operator who modifies a facility every day for a year without satisfying the PSD requirements presumably commits a violation every day and is subject to one year's worth of daily fines—or more than $13 million.

But even assuming that the EPA is correct that only a single daily fine applies, that penalty is not "laughably inadequate to encourage PSD compliance." *Id.* Congress has endowed the EPA with other tools to

38

deter would-be violators—from injunctive remedies that include terminating new construction and requiring extensive modifications, *see* 42 U.S.C. § 7477, to criminal penalties against those who "knowingly violate[]" the Clean Air Act, including by failing to obtain a PSD permit before construction or modification, *see* 42 U.S.C. § 7413(c)(1).  And its enforcement arsenal is not limited to violators.  If a state under-enforces the Clean Air Act or its own SIP, the EPA can take action to bring the SIP into compliance and can even directly revise the SIP if necessary.  40 C.F.R. § 51.166(a)(3).

Nor is the EPA unable to know which sources are modified or constructed.  To be sure, sources are not required to report or obtain a PSD permit for routine maintenance that they believe falls below a "major modification."  But that does not consign the EPA to playing whack-a-polluter by guessing which sources should be the target of its enforcement efforts.  The EPA is statutorily empowered to require any source owner or operator, regulated party, or any person "who the Administrator believes may have information necessary" for implementing the Clean Air Act and determining violations—that is, nearly anyone in the United States—"on a one-time, periodic, or continuous basis" to keep records, make reports, and submit to inspections, monitoring, and emissions sampling, and "provide such other information as the Administrator may reasonably require."  42 U.S.C. § 7414(a).  States, as the Clean Air

39

Act's primary enforcers, have similarly broad investigative powers. Given the breadth of these powers, we see no reason why the EPA and States lack authority to require the advance reporting of some or all proposed changes to facilities, whether or not they rise to a modification.

At the end of the day, there may or may not be a reasonable explanation for Congress's choice not to impose the PSD requirements as operational conditions. On one hand, the Clean Air Act was not designed solely for the purpose of saving the environment at all costs. Like any legislation, it is a congressional compromise between competing purposes—in the Clean Air Act's case, "between interests seeking strict schemes to reduce pollution rapidly" and other "interests advancing the economic concern that strict schemes would retard industrial development." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 847 (1984). As a result, Congress designed the Clean Air Act to protect the nation's air quality and to protect the "reasonable expectations of facility operators" and the "significant investment of regulatory resources made by state permitting agencies." *Otter Tail Power Co.*, 615 F.3d at 1022. That compromise might well be reflected in the omission of PSD requirements as operational conditions: If the EPA does not object within five years of the completion of a facility's modification, then it loses the right to seek civil penalties under the statute of

40

limitations, but can still obtain an injunction requiring the owner or operator to comply with the PSD requirements. But when more than five years have passed since the end of construction and the facility has been taken over by new owners and operators, the Clean Air Act protects their reasonable investment expectations.

On the other hand, perhaps the omission of PSD requirements as operational conditions was simply an oversight. Congress pieced together the Clean Air Act over decades as it reacted to the latest regulatory obstacles. And there is some evidence that whenever the topic of the PSD permitting process arose, Congress simply assumed that a PSD permit would be issued before construction or modification began. *See* H.R. Rep. No. 95-294, at 144–45 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1077, 1223–24; S. Rep. No. 95-127, at 32 (1977); H.R. Rep. No. 95-564, at 153 (1977) (Conf. Rep.), *reprinted in* 1977 U.S.C.C.A.N. 1502, 1533; *see also* Julie Martin, Note, *Enforcement for Construction Without PSD Permit and BACT Compliance*, 16 N.Y.U. Envtl. L.J. 563, 619 (2008) (explaining that because of Congress's assumption, the "Clean Air Act does not explicitly address the possibility of a facility's construction and eventual operation without the requisite permission to install uncontrolled emissions sources"). Either way, we cannot modify the statute: if an intentional choice reflecting a compromise, we cannot adjust the bargain Congress has struck; if an oversight,

we cannot usurp legislative authority to fix the omission. *See, e.g.*, *Rodriguez*, 480 U.S. at 526 ("Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law.").

Aside from the federal statutes and regulations, the EPA turns to the Pennsylvania SIP as a source of freestanding PSD requirements.[16] But Pennsylvania's SIP merely parallels the Clean Air Act's PSD requirements and does nothing to transform the PSD permitting requirements into operating conditions. For example, 25 Pa. Code § 127.11 prohibits a person from "caus[ing] or permit[ting] *the construction or modification*"—not operation—"of an air contamination source" unless the Pennsylvania Department of Environmental Protection has approved the source's plan for construction or modification. And like the EPA's own regulation at 40 C.F.R. § 52.21(r)(1), the Pennsylvania SIP requires sources to operate in compliance with their application for plan approval and

---

[16] The EPA has approved Pennsylvania's SIP. *See* 40 C.F.R. §§ 52.2020–52.2063; 37 Fed. Reg. 10,842, 10,889 (May 31, 1972); 49 Fed. Reg. 33,127 (Aug. 21, 1984); 61 Fed. Reg. 39,597 (July 30, 1996).

"the conditions in the plan approval issued by the Department"—which does not prohibit operation without an approved plan (or PSD permit). 25 Pa. Code § 127.25. To be sure, the Pennsylvania SIP does authorize the Department to "issue an operating permit to an existing and operating source that is out of compliance with . . . the Clean Air Act or the regulations thereunder." 25 Pa. Code § 127.445(a). But that provision, which *allows the Department* to issue corrective operating permits for sources lacking required PSD permits, hardly *requires the owners and operators* to apply for PSD permits as a condition of operation.

The Pennsylvania SIP's omission of any language imposing an operational duty to obtain an approved plan (or PSD permit) aligns this case with the Eighth and Eleventh Circuits' decisions, both of which refused to infer ongoing obligations from SIPs with similar language. *Otter Tail Power Co.*, 615 F.3d at 1015; *Nat'l Parks 11th Cir.*, 502 F.3d at 1323–25. That same omission distinguishes this case from the Sixth Circuit's decision in *National Parks Conservation Association v. Tennessee Valley Authority*, which interpreted the Tennessee SIP's unique language as "establish[ing] that the duty to obtain a construction permit containing the proper emissions limits is ongoing, even *post*-construction." *Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.*, 480 F.3d 410, 419 (6th Cir. 2007); *see also Midwest Generation, LLC*, 720 F.3d at 64 ("[T]he [S]ixth

43

[C]ircuit's decision rests on Tennessee statutes and implementation plans that require certain sources to *use* [BACT] . . . .").

In short, § 7475(a) unambiguously prohibits only constructing or modifying a facility without meeting PSD requirements.[17]  The Current Owners have done neither;

---

[17] The EPA relies on various regulations that purport to create operational duties to obtain a PSD permit and use BACT.  With these regulations in hand, it claims *Chevron* deference for the regulations' interpretation of the Clean Air Act and *Auer* deference for its interpretation of those regulations.  This argument fails at each step.  First, the cited regulations unambiguously track the PSD program in prohibiting only construction or modification, not operation, without getting a PSD permit or using BACT. *See Otter Tail Power Co.*, 615 F.3d at 1016–17.  Second, the EPA is not entitled to *Auer* deference because the regulations are clear. *Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000) ("*Auer* deference is warranted only when the language of the regulation is ambiguous.").  Third, even if the regulations were ambiguous, we would still not defer to the EPA's interpretation of the PSD regulations as imposing operational duties because such an interpretation would contradict the unambiguous text of § 7475(a). *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 295 (3d Cir. 2012)

44

they have only operated the Plant. As a result, the District Court correctly dismissed the civil-penalty and injunctive relief sought against the Current Owners.[18]

## 2. Against the Former Owners

That leaves the PSD claims against the Former Owners. Although the EPA has been less than forthcoming about what its proposed injunction would accomplish, it has offered two possibilities: (1) ordering the Former Owners to install BACT at the Plant, and (2) ordering the Former Owners to purchase emissions

("[W]e need reach the [*Chevron*] deference question only if the statutory language is ambiguous.").

[18] The EPA does not argue that the statute of limitations should be equitably tolled—an argument we need not address. *See* Michael J. Cole, *A Blueprint for EPA: How the Agency Can Overcome the Statute of Limitations When Enforcing PSD Under the Clean Air Act*, 31 Utah Envtl. L. Rev. 181, 192 (2011) (arguing that "courts should toll the statute of limitations for a power plant's PSD violations if the plant fails to disclose to the state authorities that it undertakes a major modification"); *see also Knight v. Brown Transp. Corp.*, 806 F.2d 479, 484 (3d Cir. 1986) (acknowledging that equitable tolling applies where the defendant had a duty to disclose information to the plaintiff and the defendant's failure to disclose information prevented the plaintiff from realizing that he had a claim).

45

credits and retire them unused, effectively reducing the amount of sulfur dioxide that facilities elsewhere in the nation can emit. The District Court dismissed this request for a permanent injunction, concluding that mandatory injunctions are available only for ongoing violations and "the Former Owners' alleged PSD violations constituted wholly[] past failures to obtain pre-construction permits that did not constitute continuing violations." JA29. We will affirm that dismissal on a narrower ground. The text of the Clean Air Act does not authorize an injunction against former owners and operators for a wholly past PSD violation, even if that violation causes ongoing harm.[19] *See Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999) ("[W]e may affirm [the District Court's decision] on any ground supported by the record.").

The Clean Air Act authorizes the EPA to bring a civil enforcement action when any person has violated a permit or SIP, has violated any requirement in certain subchapters of the Clean Air Act (including the PSD program), or "attempts to construct or modify a major stationary source" in any state that the EPA

---

[19] Because we base our conclusion solely on the statutory text of the Clean Air Act, we express no opinion on the District Court's conclusion that mandatory injunctions are not available in general to remedy ongoing harm from wholly past violations.

46

Administrator has found out of compliance with the New Source Review program. 42 U.S.C. § 7413(a)(5), (b)(1)–(3). That same provision limits a district court's jurisdiction to awarding certain kinds of relief. District courts have jurisdiction only "to restrain such violation, to require compliance, to assess such civil penalty, to collect [certain] fees owed the United States," and "to award any other appropriate relief." *Id.* § 7413(b). Each type of relief in this list (except for civil penalties[20]) is necessarily forward-looking. A district court, for example, cannot "collect" fees that were owed to the United States in the past but are no longer owed. And with time travel yet to be discovered, it is impossible to "restrain" a violation that occurred twenty years ago. Likewise, courts cannot "require compliance" from defendants who are not currently violating the Clean Air Act and who cannot violate the Act in the future because they no longer own or operate the source. *Cf. Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 59 (1987) (interpreting the Clean Water Act's citizen-suit provision, which authorizes citizens to seek civil penalties against a person who "is in violation" of

---

[20] Civil penalties are the only type of relief in this list that can be imposed for past violations. That fact does not change our analysis because the separate five-year statute of limitations authorizes civil penalties for violations up to five years in the past, and civil penalties—as opposed to injunctive relief—are necessarily retrospective.

47

the Act, and concluding that this phrase "makes plain" that the "harm sought to be addressed by the citizen suit [must] lie[] in the present or the future, not the past").

The only remaining term in the statute—"any other appropriate relief"—might initially appear to give district courts broad authority to fashion injunctive relief against former owners and operators. But this general catch-all cannot be read so broadly as to authorize an injunction for completed violations. Under the canon of *ejusdem generis*, a "general term" ("any other appropriate relief") following a "series of specific items" ("restrain such violation," "require compliance," and so on) "is confined to covering subjects comparable to the specifics it follows." *Hall Street Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 586 (2008); *see also Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 385 (2003) (interpreting "other legal process" as limited to "some judicial or quasi-judicial mechanism" transferring property to discharge liability to be consistent with the preceding terms "levy, attachment, [and] garnishment"); *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001) (interpreting "any other class of workers engaged in foreign or interstate commerce" after "seamen" and "railroad employees" as covering only transportation workers).

Of course, Congress does not intend every seemingly open-ended phrase to be read narrowly. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 226 (2008)

48

("[W]e do not woodenly apply limiting principles every time Congress includes a specific example along with a general phrase."). From time to time, a broadly worded statutory term is intended to be just that—broad. For example, Congress sometimes inserts "technically unnecessary" examples along with a general description of those examples not because it intends the general term to be narrow, but instead "out of an abundance of caution" to ensure the general term will be interpreted as capturing those examples. *Fort Stewart Sch. v. Fed. Labor Relations Auth.*, 495 U.S. 641, 646 (1990); *see also Circuit City Stores, Inc.*, 532 U.S. at 140 & n.4 (Souter, J., dissenting) (declining to apply *ejusdem generis* where the statute indicates a "special reason for emphasizing specific examples of a statutory class" that "negate[s]" a narrow interpretation of the general term). In addition, just as we "typically use *ejusdem generis* to ensure that a general word will not render specific words meaningless," *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 131 S. Ct. 1101, 1113 (2011), the opposite is also true: general phrases cannot be so narrowly construed that they become meaningless, *see Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2171 (2012) (citing *United States v. Alpers*, 338 U.S. 680, 682 (1950)).[21] And finally, not every general or vague phrase

---

[21] The EPA does not argue that our interpretation of "any other appropriate relief" in § 7413(b) leaves that phrase meaningless. In any event, without speculating too much

49

following an enumerated list is a catch-all. Some statutes use a general phrase not as a residual category intended to be a more general description of the preceding terms, but instead use each of the terms, including the general phrase, as independent and unrelated statutory categories. *See Ali*, 552 U.S. at 226 (declining to apply *ejusdem generis* to the "disjunctive" phrase "any officer of customs or excise or any other law enforcement officer"); *Watt v. W. Nuclear, Inc.*, 462 U.S. 36, 44 n.5 (1983) (declining to apply *ejusdem generis* to the phrase "coal and other minerals").

Yet sometimes a catch-all is just a catch-all. That is true here. "Any other appropriate relief" follows "a list of specific items separated by commas." *Ali*, 552 U.S. at 225. As the word "other" demonstrates, this general phrase is a residual category of the same type as the preceding items (namely, kinds of relief). *Id.* The

---

on questions not before us, we can readily conceive of injunctive relief for an ongoing violation that does not either "restrain" that violation or "require compliance." For instance, an owner or operator with an ongoing violation might be ordered not only to correct the violation and bring its pollution into compliance with any emission requirements, but also place it on a probationary period requiring more stringent monitoring, submission to regular inspections, or reporting all changes to its facility to prevent future violations.

50

specific types of relief do not overlap or otherwise suggest that they are mere examples of "any . . . appropriate relief." Consequently, any injunctive relief available under this residual phrase must be limited to ongoing violations, consistent with the specific forward-looking injunctive remedies that precede it.The EPA disagrees, insisting on a broad and flexible interpretation of "any appropriate relief." Wielding a separate canon of interpretation, the EPA argues that remedial statutes like the Clean Air Act must be interpreted broadly to effectuate their remedial purposes. As an initial matter, we doubt that such a broad interpretive rule can be justified on its own terms. *See Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 51 (2008) (rejecting this canon's application to a statute that Congress had more than a "single purpose" in enacting (internal quotation marks and citation omitted)). As the Supreme Court has consistently reminded courts, "no legislation pursues its purposes at all costs." *Pension Benefits Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 646 (1990) (quoting *Rodriguez*, 480 U.S. at 525–26); *see also FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2242 (2013) (Roberts, C.J., dissenting); *Dolan v. United States*, 130 S. Ct. 2533, 2547 (2010) (Roberts, C.J., dissenting); *Woodford v. Ngo*, 548 U.S. 81, 117 (2006) (Stevens, J., dissenting). That principle applies even to remedial statutes (and what laws are not designed to remedy some problem?). "[I]t frustrates rather than effectuates legislative intent simplistically to assume that *whatever*

51

furthers the statute's primary objective"—such as remedying environmental harms—"must be the law." *Rodriguez*, 480 U.S. at 525–26.

But even if such an interpretive rule were a justifiable one, it would not trump the textual clues to the contrary. Not all interpretive rules are created equal. Some are descriptively justified, establishing rules about how Congress and the public use language as well as "regularize[ing] the courts' approach to some recurring sources of ambiguity in English syntax." Caleb Nelson, *Statutory Interpretation* 82 (2011); *see also* Stephen F. Ross, *Where Have You Gone, Karl Llewellyn? Should Congress Turn Its Lonely Eyes to You?*, 45 Vand. L. Rev. 561, 563 (1992) (proposing this distinction); Cass R. Sunstein, *Interpreting Statutes in the Regulatory State*, 103 Harv. L. Rev. 405, 454–60 (1989) (similar). Examples of those language-based heuristics include the presumptions that "words used in a statute are to be given their ordinary meaning," *Burns v. Alcala*, 420 U.S. 575, 581 (1975), that "identical words used in different parts of the same statute" have the same meaning, *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005), that statutory text should not be interpreted "in a way that makes part of it redundant," unnecessary, or meaningless, *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 669 (2007), that adjectives and other modifiers refer only to the last antecedent, *see Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 342–43 (2005),

and—most relevant here—that a general catch-all should be interpreted in light of any preceding specific terms. Others are normatively justified, designed to achieve certain policy goals that courts have identified. Nelson, *Statutory Interpretation* 82 ("[A]t least some of the canons . . . put thumbs on the scale in favor of certain substantive policies[,] . . . telling courts how to proceed when their information about the enacting legislature's likely intent has run out."). The most familiar example is the rule of lenity. And the remaining canons are hybrids whose scope can be fully explained only by a combination of descriptive and normative justifications. *See* Nelson, *Statutory Interpretation*, 138, 146 (cataloguing the various canons and offering the saving canon and constitutional-avoidance doctrine as two examples of hybrid canons).

Consistent with our focus on determining the meaning of the text itself, we turn to our descriptive canons first whenever we confront a statute we must interpret. *See id.* at 228 ("[T]here is fairly widespread agreement that so-called 'descriptive' canons occupy a higher place in the interpretive hierarchy than so-called 'normative' canons."); *id.* at 229 ("To the extent that a single canon serves both 'descriptive' and 'normative' goals, moreover, courts should try to avoid letting the canon's normative aspirations swamp the descriptive force of other canons."). If our descriptive tools settle the meaning, then our task is complete. In such a case,

53

we do not even consider interpretive tools partially or purely based on normative goals. *See, e.g.*, *United States v. Wells*, 519 U.S. 482, 499 (1997) ("The rule of lenity applies only if, after seizing everything from which aid can be derived, . . . we can make no more than a guess as to what Congress intended." (internal quotation marks and citations omitted)).

Such is the case here. Our descriptive tools of interpretation clarify any vagueness in the phrase "any other appropriate relief." As we have explained, the canon of *ejusdem generis* requires us to interpret this catch-all as permitting forward-looking relief, consistent with the preceding types of relief in the list. Allowing the EPA's remedial-purpose canon to trump *ejusdem generis* would amount to little more than disguising a purpose-driven interpretation as a canon. The PSD program's other enforcement provision confirms the prospective nature of injunctive relief allowed. Section 7477 authorizes "injunctive relief[] as necessary to prevent the construction or modification of [certain] major emitting facilit[ies]." An injunction to remedy modifications completed in the past without a PSD permit cannot "prevent" the construction.

And even if the phrase "any other appropriate relief" can include injunctions against former owners and past violators, the requested injunctions in this case are not "appropriate." Whatever the breadth of that phrase, it would not be "appropriate" for a district court to award

54

relief that is impossible to fulfill. Ordering the Former Owners to install BACT on a plant they no longer own, operate, or have access to is just the sort of impossible relief that would not be "appropriate." That is especially so given that a "mandatory injunction . . . is an extraordinary remedial process." *Morrison v. Work*, 266 U.S. 481, 490 (1925) (Brandeis, J.); *United States v. Bigan*, 274 F.2d 729, 733 (3d Cir. 1960) (same).

The EPA tries to cure this impropriety in two ways. First, it proposes that the District Court enjoin the Current Owners to cooperate with the Former Owners to install BACT. Or, the EPA suggests, the District Court can order the Former Owners to pay the Current Owners for the cost of BACT and order the Current Owners to install it.

Both of these proposals suffer from the same flaw. As we have already held, the Current Owners cannot be held liable for violating the PSD or BACT requirements. If the Current Owners cannot be held liable, then the District Court has no authority to enjoin them at all. *See Ciba-Geigy Corp. v. Bolar Pharm. Co., Inc.*, 747 F.2d 844, 850 (3d Cir. 1984) (holding that a plaintiff must first establish a successful claim on the merits against a party before being eligible to obtain injunctive relief against that party). Without the cooperation of the Current Owners, the Former Owners "would not be able to comply with a court order directing [them] to install pollution control measures, because [they] no longer

55

control[] the plant." *N.J. v. Reliant Energy Mid-Atlantic Power Holdings, LLC*, 2009 WL 3234438, at *17 (E.D. Pa. 2009). Given these constraints on remedying the Former Owners' past alleged violations of the PSD program and the EPA's failure to allege "a continuing violation or the likelihood of a future violation," injunctive relief against the Former Owners "will not redress [the public's] injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998).

Second, the EPA proposes that the District Court order the Former Owner to purchase and retire emissions credits to offset pollution elsewhere in the nation. This proposal fares no better. Such injunctive cap-and-trade relief is the equivalent of awarding monetary relief and "could not reasonably be characterized as an injunction." *United States v. Midwest Generation*, 781 F. Supp. 2d 677, 685 (N.D. Ill. 2011), *aff'd on other grounds by* 720 F.3d 644, 648; *see In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1145 (3d Cir. 1982) ("[W]e have never upheld an injunction where the claimed injury constituted a loss of money, a loss capable of recoupment in a proper action at law."). It would amount to little more than an end-run around the five-year statute of limitations on "any civil fine, penalty, or forfeiture, pecuniary or otherwise." 28 U.S.C. § 2462.

In fact, the inspiration for this suggested relief comes from Title IV of the Clean Air Act—a program regulating acid rain and deposition and an entirely

56

different one than the Former Owners allegedly violated. Had Congress intended to authorize an emissions-credit marketplace for the PSD program (Title II) like the one established for the sulfur dioxide allowance program (Title IV), it would have done so. Since Congress deliberately omitted such an allowance program from the PSD program, we will not import it under the guise of injunctive relief.

Indeed, when Congress has wanted to authorize mandatory remedial injunctions in other environmental statutes, it has done so expressly. *See* 42 U.S.C. § 9607(a)(2) (extending liability under CERCLA to "any person who at the time of disposal of any hazardous substances owned or operated any facility at which such hazardous substances were disposed of"); 33 U.S.C. § 1321(b)(9) (broadly authorizing orders to "mitigate the damage to the public health or welfare caused by [a] discharge"). Congress chose not to extend such remedial authority to the Clean Air Act.

Finally, and tellingly, the EPA concedes that in the forty-plus years of the Clean Air Act, no court has ever approved such an injunction against former owners. *See* Oral Arg. Tr. at 16:19–21. We decline to be the first.

## B. <u>Title V Claims</u>

In addition to its PSD claims, the EPA alleges that the Current and Former Owners violated the Title V

57

operating-permit program. The Former Owners' Title V application was allegedly incomplete because it did not include applicable PSD requirements or BACT controls. And the Current Owners' facially valid permit is supposedly inadequate because it omits the same requirements—even though the EPA approved the application, issued the permit, and recently renewed the permit without objection. The District Court dismissed these claims on the merits, concluding that Title V does not make incomplete applications and permits civilly actionable. We agree with the District Court's dismissal, but for a more fundamental reason: the District Court lacked jurisdiction over these claims.[22] *See In re Flat Glass Antitrust Litig.*, 288 F.3d 83, 88 n.5 (3d Cir. 2002) (explaining our "independent responsibility" to confirm our appellate jurisdiction and the District Court's jurisdiction (quoting *In re Ford Motor Co.*, 110 F.3d 954, 958–59 (3d Cir. 1997))).

As the Seventh, Eighth, and Ninth Circuits have held, Title V channels challenges to applications and permits into an administrative review process that is reviewable exclusively by the courts of appeals, not collaterally in civil or criminal enforcement actions in the

---

[22] To the District Court's credit, it "harbor[ed] substantial subject-matter jurisdiction concerns as to its authority to decide" the Title V claims for the same reasons we express here.

58

district courts. *Otter Tail Power Co.*, 615 F.3d at 1020; *Romoland Sch. Dist. v. Inland Empire Energy Ctr., LLC*, 548 F.3d 738, 742–43 (9th Cir. 2008); *United States v. AM Gen. Corp.*, 34 F.3d 472, 475 (7th Cir. 1994); *see also N.Y. Pub. Interest Research Grp., Inc. v. Johnson*, 427 F.3d 172, 185 (2d Cir. 2005) ("[A]n enforcement proceeding does not relieve the EPA of its obligations under the permitting process."). We begin with § 7661d, which establishes a comprehensive system for the EPA's review of Title V applications and proposed permits. "Congress entrusted state permitting authorities with initial responsibility to make BACT determinations 'case by case.'" *Alaska Dep't of Envtl. Conservation*, 540 U.S. at 488 (quoting 42 U.S.C. § 7479(3)). Title V requires these state permitting authorities to submit permit applications and proposed permits to affected states and the EPA for review. 42 U.S.C. § 7661d(a)(1). The permitting authority must give the states an opportunity to review the application or proposed permit and submit written recommendations; if the authority declines to adopt any state recommendation, it must notify that state and the EPA and explain its reasoning. *Id.* As to the EPA's review, the Administrator has a duty to object to "any permit [that] contains provisions" she determines to be "not in compliance with" the Clean Air Act. *Id.* § 7661d(b)(1). If the Administrator objects, then the permit may not be issued unless it is revised to meet the objections. *Id.* §§ 7661d(b)(3), (c). And if the permitting authority has already issued the permit, then the

59

Administrator must "modify, terminate, or revoke such permit," and the permitting authority may only issue a permit revised to satisfy the objection. *Id.* If the EPA does not object, then "any person may petition the Administrator within 60 days after the expiration of the 45-day review period" to object on the public's behalf. *Id.* § 7661d(b)(2). The Administrator must then grant or deny the petition within 60 days. *Id.* "Any denial of such petition shall be subject to judicial review under" 42 U.S.C. § 7607. *Id.*

Section 7607(b)(1), in turn, authorizes direct review of the Administrator's decision in the courts of appeals. *Id.* § 7607(b)(1) ("A petition for review of . . . any other final action of the Administrator under [the Clean Air Act] (including any denial or disapproval by the Administrator under [Title V]) . . . may be filed only in the United States Court of Appeals for the appropriate circuit . . . ."); *Otter Tail Power Co.*, 615 F.3d at 1020; *Romoland*, 548 F.3d at 743. Such review may take place *only* in the court of appeals—subsection (b)(2) divests the district courts of jurisdiction over the Administrator's decision. 42 U.S.C. § 7607(b)(2) ("Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement."). Consequently, Congress created a "use it or lose it" provision for reviewing the EPA's failure to object to a proposed Title V permit. *Romoland*, 548 F.3d

60

at 755. If review of the Administrator's decision not to object to a Title V application or permit "could have been obtained" through this process, then that challenge cannot be brought in an enforcement proceeding.

Here, the EPA claims that the Current Owners' Title V permit, though facially valid, is missing applicable PSD requirements and BACT controls. And the EPA (but not the States) claims that the Former Owners' Title V application was incomplete because it omitted those same requirements. But each of these claims "amounts to an allegation that the permit 'is not in compliance with the requirements of'" the Clean Air Act, "claim[s] which could have been pressed during the permitting process." *Otter Tail Power Co.*, 615 F.3d at 1020. If the EPA Administrator believed the application or permit was deficient, Title V required her to object during the permitting process. 42 U.S.C. § 7661d(b)(1). Yet twice she chose not to—either during the original permitting process from 1995 to 2004 or again when the Current Owners' permit was renewed in 2012. And those failures to object "could have been" directly reviewed in this Court through the exclusive process established by Title V. Consequently, § 7607(b)(2) divests the District Court of jurisdiction over the EPA's collateral challenges to the Former Owners' application

61

and the Current Owners' permit.[23]

The EPA musters three cases that purportedly support such collateral challenges in enforcement proceedings. U.S. Opening Br. at 57; *see Sierra Club v. EPA (Sierra Club 6th Cir.)*, 557 F.3d 401, 405–11 (6th Cir. 2009); *Citizens Against Ruining the Env't v. EPA*, 535 F.3d 670, 678 (7th Cir. 2008); *Sierra Club 11th Cir.*, 541 F.3d at 1267. But those cases say no such thing. None of them addresses § 7607's jurisdiction-stripping provision or even whether a district court has jurisdiction over collateral challenges to Title V permits and applications in enforcement actions. They instead interpret one of the statutory triggers for the EPA Administrator's duty to object to a Title V application or permit during the administrative review process: whether a private petitioner has sufficiently "demonstrated" that the application or permit does not comply with the Clean Air Act such that the Administrator must object. *See* 42 U.S.C. § 7661d(b)(2). In fact, in each of these cases, the party seeking review of the Administrator's failure to object did so by petitioning for direct review in the court

---

[23] Given § 7607(b)(2)'s unambiguous elimination of the District Court's jurisdiction in this case, we do not defer to the EPA's contrary interpretation. *See Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 295 (3d Cir. 2012) ("[W]e need reach the deference question only if we find the statutory language is ambiguous.").

of appeals—consistent with our interpretation of § 7607. *See Sierra Club 11th Cir.*, 541 F.3d at 1263; *Citizens Against Ruining the Env't*, 535 F.3d at 674; *Sierra Club 6th Cir.*, 557 F.3d at 405.

The elimination of district-court jurisdiction over collateral challenges to Title V permits and applications is further confirmed by Congress's omission of any civil cause of action for submitting incomplete applications or operating under a validly issued but incomplete permit. The EPA has authority to bring a civil enforcement action against a person who, among other things, "has violated, or is in violation of, any other requirement or prohibition of [various subchapters, including Title V]." 42 U.S.C. § 7413(b)(2). The plain text of Title V, in turn, lists only two ways in which it can be violated: operating without a Title V permit or violating the terms of a Title V permit while operating a source. *See id.* § 7661a(a) (making it "unlawful for any person to violate any requirement of a permit issued under this subchapter, or to operate [a source] except in compliance with a permit issued by a permitting authority under this subchapter").

What that text does not include as a violation, however, is operating in accordance with a facially valid but inadequate Title V permit. As the Seventh Circuit has explained, there is simply no "indication that Congress expressly or by implication meant to authorize the EPA" to bring an enforcement action against current

owners, who have "been operating under a permit valid on its face and never before challenged." *AM Gen. Corp.*, 34 F.3d at 475; *see also United States v. Cemex, Inc.*, 864 F. Supp. 2d 1040, 1050 (D. Colo. 2012) ("The Court sees no possible interpretation of this language that would permit a cause of action for the failure to obtain a 'proper' operating permit."). To be sure, as the EPA points out, Title V requires permits to include "enforceable emission limitations . . . and other such conditions as are necessary to assure compliance with applicable requirements of [the Clean Air Act]." 42 U.S.C. § 7661c(a). But just because the statute requires complete permits does not mean that incomplete permits are actionable in an enforcement action. Indeed, § 7661a(a)'s failure to make it unlawful to transgress this complete-permit requirement requires us to conclude that such conduct is not a civilly enforceable "violation" of Title V. *See Sebelius v. Cloer*, 133 S. Ct. 1886, 1894 (2013) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks and citation omitted)).

Nor does Title V make submitting an incomplete permit application unlawful. The plain text of § 7661a(a) does not list "submitting incomplete permit applications" as a violation of Title V. Of course, as the EPA points

64

out, Title V requires a permit application to include a "compliance plan describing how the source will comply with all applicable requirements [in the Clean Air Act]." 42 U.S.C. § 7661b(b)(1). Again, the fact that Congress chose to include this complete-application requirement but did not include the failure to satisfy that requirement as a violation of Title V must be presumed deliberate. In short, Congress's decision not to authorize district-court actions for incomplete applications or validly issued but inadequate permits makes it unsurprising that § 7607 divests the district courts of jurisdiction over such collateral challenges. The thoroughness of the administrative review process—combined with the mandatory denial of applications and proposed permits as well as the mandatory revocation of prematurely issued, non-compliant permits—indicates Congress's contemplation that deficiencies in Title V applications and proposed permits would come to light and be corrected through this administrative process.

On the other hand, consider the problems that would arise if applications and permits could be challenged in an enforcement proceeding. The EPA could bring parallel suits—an enforcement proceeding in the district court to challenge the Title V permit and direct review by the court of appeals to challenge the Administrator's failure to object during the administrative process. Such "simultaneous suits by multiple parties raising the same or similar issues" would

65

"not only waste judicial resources, but could also result in inconsistent decisions." *Otter Tail Power Co.*, 615 F.3d at 1022; *Romoland*, 548 F.3d at 755. More importantly, "allow[ing] plaintiffs to raise issues resolved during the permitting process long after that process is complete would upset the reasonable expectations of facility operators and undermine the significant investment of regulatory resources made by state permitting agencies." *Otter Tail Power Co.*, 615 F.3d at 1022. Nor does this exclusive review process prevent the EPA from correcting deficiencies in a permit application or from fixing an inadequate Title V permit. If the application or proposed permit is deficient, the EPA must deny it or require supplemental information during the permitting process. *See* 42 U.S.C. § 7661d(b)(1). And the threat of criminal charges confronts any person who knowingly submits a deficient application. 42 U.S.C. § 7413(c)(2)(A). Even if the deficiencies are overlooked and remain undiscovered until after the permit is issued—as they allegedly were in this case—the proper avenue is for the EPA or states to reopen the permit to add any "applicable requirement" that was omitted during the permitting process. 40 C.F.R. § 70.7(f); *see also* 42 U.S.C. § 7661d(e); 25 Pa. Code §§ 127.542, 127.543.

Consequently, the District Court lacked

66

jurisdiction over the EPA's Title V claims.[24]

## C. <u>State-Law Claims</u>

The Pennsylvania Department of Environmental Protection and New York also appeal the dismissal of various state-law claims under the Pennsylvania Air Pollution and Control Act, Pennsylvania SIP, and common-law public nuisance. They concede that these claims track the federal claims. *See* Dist. Ct. Op., JA36; States Br. at 67. And to the extent the state-law claims differ from the federal ones, the District Court found that "[t]hese claims were not thoroughly developed." *Id.* We

---

[24] The EPA spars with the Current Owners over whether the Current Owners are insulated from liability by Title V's safe-harbor provision. Title V contains two permit shields—one that precludes Title V liability if an owner or operator "compli[es] with a permit issued in accordance with" Title V, and a second that insulates an owner or operator from liability for violating "other applicable provisions" of the Clean Air Act if it complies with a Title V permit that either expressly includes those provisions or states that they are inapplicable. 42 U.S.C. § 7661c(f). But these permit shields are merely sideshows. Even assuming the EPA is correct that neither permit shield protects the Current Owners, the availability of this defense has no bearing on whether § 7607 strips district courts of jurisdiction over collateral challenges to Title V permits.

will affirm their dismissal. *See Steagald v. United States*, 451 U.S. 204, 209 (1981) (holding that arguments not developed in district court are forfeited on appeal); *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 262 (3d Cir. 2009) ("A fleeting reference or vague allusion to an issue will not suffice to preserve it for appeal[.]").

## III.

In an age when coal-burning power plants mingle with electric cars and when our scientific understanding of the planet grows at the same exponential rate that our natural resources deteriorate, protecting the environment is an almost-fearsome responsibility. But when Congress's statutory directives are at issue, that responsibility must yield to our duty to follow our coordinate branch's commands. Those commands could not be plainer here. We will affirm the District Court's order dismissing the EPA's and States' claims.